# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MATTHEW CARR, TERRY CARR, DAVID TUMBLIN AND GREGORY BROWN, on behalf of themselves and others similarly situated,** | **CIVIL ACTION** |
| **Plaintiffs,** | |
| **v.** | **NO. 15-6391** |
| **FLOWERS FOODS, INC. AND FLOWERS BAKING CO. OF OXFORD, INC.,** | |
| **Defendants.** | |

| | |
|---|---|
| **LUKE BOULANGE, on behalf of himself and others similarly situated,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | **NO. 16-2581** |
| **FLOWERS FOODS, INC. AND FLOWERS BAKING CO. OF OXFORD, INC.,** | |
| **Defendants.** | |

## OPINION

Plaintiffs in this suit are distributor drivers for a baked goods retailer, who assert that they have been improperly categorized as independent contractors rather than employees under federal and state law, and thereby deprived of overtime pay, other wages, and records. Named plaintiffs Matthew Carr, Terry Carr, David Tumblin, Gregory Brown, and Luke Boulange bring suit on behalf of themselves and others similarly situated (collectively, "Plaintiffs") against defendants Flowers Foods, Inc. and its subsidiary, Flowers Baking Company of Oxford, Inc., (collectively, "Defendants" or "Flowers") for violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.*; the Pennsylvania Wage Payment and Collection Law

("PWPCL"), 43 P.S. §§ 260.1, *et seq.*; the Pennsylvania Minimum Wage Act ("PMWA"), 43 Pa. C.S.A. §§ 333.101, *et seq.*; the Maryland Wage and Payment Collection Law ("MWPCL"), Md. Code Ann., Lab. & Empl. §§ 3-501, *et seq.*; the Maryland Wage and Hour Law ("MWHL"), Md. Code Ann., Lab. & Empl. §§ 3-401, *et seq.*; the New Jersey Wage and Payment Law ("NJWPL"), N.J. S.T. 34:11–4.1, *et seq.*; and the New Jersey Wage and Hour Law ("NJWHL"), N.J. S.T. 34:11–56a, *et seq.*

On January 9, 2017, Plaintiffs' FLSA claims were conditionally certified as a collective action. Defendants now move to decertify that collective action. Separately, Plaintiffs move to certify three independent class actions pertaining to three states—Pennsylvania, Maryland, and New Jersey—where distributors work. Accordingly, the issue before the Court is whether Plaintiffs' claims are suitable for group adjudication. Specifically, with regard to the FLSA, the Court must determine whether the named plaintiffs and approximately one hundred other distributors who have opted into this lawsuit may receive final certification to proceed as a collective. Separately, the Court must determine whether three classes, representing the distributors of Pennsylvania, Maryland, and New Jersey, may be certified under Fed. R. Civ. P. 23.

For the reasons that follow, Defendants' motion to decertify the FLSA collective action shall be denied, and the FLSA collective shall receive final certification. Further, Plaintiffs' motions to certify the state class actions shall be granted with respect to the Rule 23(b)(3) classes and denied with respect to the Rule 23(b)(2) classes.

## I.     FACTS

Defendant Flowers Foods, Inc. is a Georgia corporation that develops and markets bakery products on a national scale through its network of subsidiaries. Defendant Flowers Baking Co.

of Oxford, Inc. ("Oxford") is one such subsidiary, which operates as the local sales and distribution manager in Pennsylvania, New York, New Jersey, Maryland, and Virginia. Plaintiffs are individual distributors who collect baked goods from Oxford warehouses and deliver them to customers—mainly stores and restaurants.

Plaintiffs have provided testimony and documentary evidence detailing their work experience as distributors with Flowers. In short, they earn money by purchasing product from Flowers at a discount rate which is fixed unilaterally by Flowers, and selling it at a higher price to customers within a designated geographic area. Their job also includes delivery of product to customer stores and stock management of the product at those stores. They pick up the products from designated Flowers warehouses; drive the products to customer locations; stock the product on customer shelves using Flowers' layout design specifications, known as "planograms"; and manage the stale, unsold product that accrues at customer locations, some of which Flowers will buy back, at a rate determined by Flowers. Generally, distributors make deliveries five days out the week, and on the other two days they will perform "pull ups," to adjust the stock on the shelves at customer stores. Orders and deliveries are tracked using handheld computers issued by Flowers, and Flowers retains in its database records generated by these computers. In fulfilling their obligations, distributors are subject to Flowers' oversight and discipline, which is principally effected through ride-alongs by Flowers' sales managers to check and maintain performance, and breach letters that identify perceived deficiencies in a distributor's work.

Distributors' employment classification changes over the course of their time with Flowers. It starts with a multi-week training program, run by Flowers, during which they are classified as employees. Once the training program is completed, Flowers decides whether or not drivers will be retained. If Flowers elects to retain them, they must sign a "Distributor

Agreement," which labels them independent contractors.  From that point forward, Flowers considers them to be independent contractors.

In addition to reclassifying distributors as independent contractors, the Distributor Agreement assigns each distributor a defined geographic area, making the distributor responsible for sales and deliveries within that area.  The Distributor Agreement also includes a number of stipulations regarding the working relationship between distributors and Flowers.  More specifically, Flowers may change the "terms and prices" of its sales to distributors "at any time"; distributors must use their "best efforts to develop and maximize" sales in accordance with "good industry practice," and "cooperate" with Flowers' marketing and sales efforts; Flowers has the right to "solicit and drop delivery accounts, in whole or in part" from the distributors' territory for "legitimate business reasons"; Flowers will determine the Flowers warehouse location where distributors collect product; distributors must provide their own delivery trucks; deliveries need not be "conducted personally," and distributors are "free to engage" outside assistance; Flowers may terminate the contract if the distributor "fails to perform [the] obligations under this Agreement"; and, finally, Flowers may issue notices where it finds a distributor to be in breach of the agreement.

Because a distributor's earnings are determined largely by the balance between the amount of sales to customers, less the amount paid to purchase the product from Flowers, sales to customers are key to their income.[1]  But the parties dispute the extent of distributors' ability to

---

[1] Distributors' earnings are also impacted by other factors—namely, stale product and deductions.  When stale, unsold product accrues at customer locations, distributors remove the product and Flowers buys back a certain amount from distributors, paying a rate determined unilaterally by Flowers.  Separately, Flowers takes various deductions out of distributors' pay.  The deductions fall in to several categories, such as administrative fees and warehouse fees.  The deductions are memorialized in settlement agreements, which outline the balance of customer account sales and the various deductions.  The settlement agreements are provided weekly, and Flowers pays distributors the balance indicated on the statement.  Flowers retains records of these statements in a computer database.

impact their sales. The testimony provided by Plaintiffs demonstrates that, for each existing customer account, Flowers compiles a "suggested order," listing recommended products, prices, and volumes, and loads the suggested order onto the handheld computer. Several distributors indicated that they felt they had some degree of control over the content of the orders, and could or did change the orders—though many stated that Flowers left them little to no discretion to deviate from the suggested orders. The parties also paint contrasting pictures of distributors' ability to add new customers on their own initiative: some distributors were able to add new accounts, while others testified that this was not permitted by Flowers.

Importantly, however, a significant portion of each distributors' sales is generated by large chain accounts, such as Walmart, rather than smaller "cash" accounts with local businesses. As the parties agree, Flowers deals with the large chain accounts directly, setting terms for, *inter alia*, pricing, products, and volume, as well as setting delivery expectations and customer requirements. By contrast, distributors may exercise more influence over the small "cash" accounts. While the large chain accounts make up varying percentages of distributors' sales, the evidence indicates that the large chain accounts comprise a majority of each individual distributor's sales: some distributors testified that sixty to seventy percent of their sales are attributable to the large chain accounts, while others indicated that such accounts make up as much as ninety-nine percent of their sales.

The testimony provided by Plaintiffs also indicates that there are some variations among distributors' work experiences. For example, some distributors hired assistants to help with their routes, though many did not. Some also delivered products for other businesses, in addition to their work for Flowers. Some were not given an hourly schedule by Flowers, while others had their schedules tightly controlled by Flowers. Some used trucks they selected and financed

independent of Flowers, while others stated that Flowers dictated the vehicle to be used.  Some closely followed Flowers' layout instructions for store displays (the "planograms"), while others testified to deviating to some degree.

All plaintiffs that are members of the FLSA opt-in collective have stated that their obligations to Flowers required them to work beyond 40 hours per week.

## II.    FLSA COLLECTIVE ACTION FINAL CERTIFICATION

The FLSA was enacted "to protect workers, particularly non-unionized workers, by establishing federal minimum wage, maximum hour, and overtime guarantees that could not be avoided through contract." *Knepper v. Rite Aid Corp.*, 675 F.3d 249, 253-54 (3d Cir. 2012).  To safeguard these protections, the FLSA permits that an action may be brought "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b).  Thus FLSA claims may be brought individually or as a collective action, "in which a named employee plaintiff or plaintiffs file a complaint 'in behalf of' a group of other, initially unnamed employees who purport to be 'similarly situated' to the named plaintiff." *Halle v. W. Penn Allegheny Health Sys. Inc.*, 842 F.3d 215, 223 (3d Cir. 2016) (quoting 29 U.S.C. § 216(b)).  "Importantly, "[m]embers of the collective must . . . opt in to the litigation . . . by filing written consents with the court." *Camesi v. Univ. of Pittsburgh Med. Ctr.*, 729 F.3d 239, 242-43 (3d Cir. 2013); *see also* 29 U.S.C. § 216(b).  "This feature distinguishes the collective-action mechanism . . . from the class-action mechanism under Federal Rule of Civil Procedure 23, where, once the class is certified, those not wishing to be included in the class must affirmatively opt-out." *Camesi*, 729 F.3d at 243.

Where a named plaintiff seeks to mount a collective action, "[c]ourts in this circuit use a two-step certification process." *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 85 (3d Cir.

2017). "The first step, so-called conditional certification, requires the named plaintiffs to make a 'modest factual showing' to demonstrate 'a factual nexus between the manner in which the employer's alleged policy affected him or her and the manner in which it affected the proposed collective action members.'" *Id.* (quoting *Halle*, 842 F.3d at 224). "The 'sole consequence' of conditional certification is the dissemination of court-approved notice to potential collective action members." *Halle*, 842 F.3d at 224 (quoting *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 74 (2013)). "Generally, after conditional certification has been granted," "individuals file notices providing their written consent to participate in the collective action pursuant to § 216(b)," thereby 'opting-in' to the collective action. *Id.* at 225. "Once opt-in consents have been filed, discovery typically moves forward to assess whether the opt-ins are 'similarly situated' to the named plaintiffs." *Id.* at 226.

Upon conclusion of discovery, the parties move on to the second step—the step at issue here. This step "may be triggered by the plaintiffs' motion for 'final certification,' by the defendants' motion for 'decertification,' or, commonly, by both." *Camesi*, 729 F.3d at 243. At this stage, the named plaintiffs "must demonstrate by a preponderance of the evidence" that they and the opt-in members of a proposed collective action are 'similarly situated.'" *Zavala v. Walmart Stores Inc.*, 691 F.3d 527, 537 (3d Cir. 2012). "Being similarly situated . . . means that one is subjected to some common employer practice that, if proved, would help demonstrate a violation of the FLSA." *Id.* at 538. Relevant factors include, but are not limited to:

> [W]hether the plaintiffs are employed in the same corporate department, division, and location; whether they advance similar claims; whether they seek substantially the same form of relief; and whether they have similar salaries and circumstances of employment. Plaintiffs may also be found dissimilar based on the existence of individualized defenses.

*Id.* at 536-37. To be found similarly situated, members of the collective need not have an

identical experience; "complete symmetry of job functions is not required for final certification under the FLSA." *Rivet v. Office Depot, Inc.*, 207 F. Supp.3d 417, 426 (D.N.J. 2016). "Once it has been determined that the plaintiffs are similarly situated (a factual question reviewed for clear error), there is no further work to be done," because the FLSA does not "give[] the district court discretion to deny certification after it has determined that plaintiffs are similarly situated." *Zavala*, 691 F.3d at 535.

### A. Members of the FLSA Collective Are Similarly Situated

The collective action here is defined as:

> All persons who are or have performed work as "Distributors" for either Defendant under a "Distributor Agreement" or a similar written contract with Defendant Oxford Baking Co. that they entered into during the period commencing three years prior to the commencement of this action through the close of the Court determined opt-in period and who file a consent to join this action pursuant to 29 U.S.C. § 216(b).

The similarities among the collective are sufficient to establish that they were "subjected to some common employer practice that, if proved, would help demonstrate a violation of the FLSA." *Zavala*, 691 F.3d at 538. As to specific factors outlined in *Zavala*, the members of the collective all work for Oxford, as distributors. Though they work at different warehouses, they are nonetheless tied to the same "corporate department" or "division," *id.*: Oxford, the Flowers subsidiary that operates throughout the region. They advance identical claims (overtime under the FLSA) and seek the same form of relief (lost overtime wages). And they have "similar salaries" and "circumstances of employment," *id.*: all make money through the same method—purchasing product at a discount margin from Flowers, selling that product to customer accounts, and delivering that product to customer stores. Thus Plaintiffs demonstrated substantial similarity among the members of the collective.

Indeed, as to a number of the most salient features of Plaintiffs' work, there is near

uniformity among the members of the collective. In particular, there is *no* variation on the primary source of their livelihood: the majority of distributors' sales come from large chain customers, which are chiefly controlled by Flowers. Further, there appears to be little to no variation as to the Flowers-operated training program they were required to complete and the general provisions included in the Distribution Agreement that outline the terms of their relationship with Flowers. Simply, as to many key points, the members of the collective were near-identically situated.

Finally, these commonalities "would help demonstrate a violation of the FLSA." *Id.* The members of the collective assert that Flowers violated the FLSA by misclassifying them as independent contractors, rather than employees, thus depriving them of overtime pay. Accordingly, the central issue is whether distributors are properly classified as employees or independent contractors under the FLSA. "The question of whether an FLSA plaintiff is [an] independent contractor or an employee is a question of law for the Court." *Leffler v. Creative Health Servs., Inc.*, 2017 WL 4347610, at *3 (E.D. Pa. Sept. 29, 2017); *see also Safarian v. Am. DG Energy Inc.*, 622 F. App'x 149, 151 (3d Cir. 2015). The FLSA defines "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). "The definition of 'employee' in the FLSA is of striking breadth and covers some parties who might not qualify as such under a strict application of traditional agency law principles." *Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 214 (3d Cir. 2015) (internal punctuation omitted).

"When determining whether someone is an employee under the FLSA, 'economic reality rather than technical concepts is to be the test.'" *In re Enter. Rent-A-Car Wage & Hour Emp. Practices Litig.*, 683 F.3d 462, 467-68 (3d Cir. 2012) (quoting *Goldberg v. Whitaker House Co- op., Inc.*, 366 U.S. 28, 33 (1961)). Six factors are considered to determine whether a worker is

an "employee" under the FLSA:

> 1) the degree of the alleged employer's right to control the manner in which the work is to be performed; 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; 3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; 4) whether the service rendered requires a special skill; 5) the degree of permanence of the working relationship; 6) whether the service rendered is an integral part of the alleged employer's business.

*Martin v. Selker Bros.*, 949 F.2d 1286, 1293 (3d Cir. 1991); *see also Safarian*, 622 F. App'x at 151 (applying *Martin* factors).[2]  Because "neither the presence nor absence of any particular factor is dispositive[,] courts should examine the circumstances of the whole activity, and should consider whether, as a matter of economic reality, the individuals are dependent upon the business to which they render service." *Donovan v. DialAmerica Mktg., Inc.*, 757 F.2d 1376, 1382 (3d Cir. 1985) (internal citations and quotation marks omitted).  "[T]he employee/ independent contractor distinction is not a bright line but a spectrum, and . . . courts must struggle with matters of degree rather than issue categorical pronouncements." *McFeeley v. Jackson St. Entm't, LLC*, 825 F.3d 235, 241 (4th Cir. 2016).

Here, the similarities among the collective "would help demonstrate" that the members of the collective were misclassified under the FLSA, *Zavala*, 691 F.3d at 538, because they speak directly to "the economic realities of the relationship [that] determin[e] employee status under the FLSA," *Martin*, 949 F.2d at 1293.  First, Flowers admits that it principally retains control over the large chain accounts, which comprise the majority of distributors' sales—meaning that

---

[2] Although the parties both contend that the FLSA test looks to a putative employer's "actual control" over the individual worker, rather than the more abstract "right to control," they do so by citing to district courts in this Circuit that have so held.  *See, e.g.*, *Spellman v. Am. Eagle Exp., Inc.*, 2013 WL 1010444 at *4 (E.D. Pa. Mar. 14, 2013) ("Under the FLSA, an alleged employer's degree of control over its alleged employees is determined by examining the employer's *actual* control, not its *right* to control.") (citing out-of-circuit authority).  However, the Third Circuit has consistently described the FLSA employee test otherwise, as looking to the "right to control."  *See Martin*, 949 F.2d 1293; *see also Donovan v. DialAmerica Mktg., Inc.*, 757 F.2d 1376, 1382 (3d Cir. 1985); *Safarian*, 622 F. App'x at 151; *but see In re Enter. Rent-A-Car Wage & Hour Employment Practices Litig.*, 683 F.3d 462, 470 (3d Cir. 2012) ("joint employer" test under FLSA looks to separate factors and "indicia of 'significant control'").

the large chain accounts take on an outsize role in defining both distributors' day-to-day responsibilities, and their pay. Accordingly, common evidence regarding Flowers' management of the large chain accounts will inform the inquiry regarding: (1) whether Flowers exercises a high degree of "control [over] the manner in which the work is to be performed," by dictating what distributors sell to these accounts, at what price, and other significant aspects of distributors' obligations to those accounts; and, (2) whether distributors' "opportunity for profit or loss" depends more on Flowers than on distributors' "managerial skill," because Flowers controls the sales to these accounts, and these accounts generate the majority of distributors' earnings. *Id.*

Second, the Distributor Agreements, signed by each distributor, also reflect common practices by Flowers that bear on the FLSA employment factors. Specifically, the agreements indicate that Flowers intended to retain control over the pricing available to distributors, to discipline distributors through breach letters, and to require distributors to cooperate with Flowers' promotional policies. The Distributor Agreements also indicate a high "degree of permanence" in the working relationship, since their terms reflect an intent to form an ongoing relationship between distributors and Flowers, with no defined end date. *Id.*

Third, several additional commonalities among the collective will also bear on the employment test. Both the training program and disciplinary regime imposed by Flowers attest to Flowers' control over "the manner in which the work is to be performed." *Id.* And, because the members of the collective were each employed in the same capacity, the questions of whether the distributor position "requires a special skill," and whether distributors perform "an integral part of [Flowers'] business" will be resolved through common evidence of the distributors' role. *Id.*

In sum, the similarities among the collective bear directly on the legal inquiry of whether they have been miscategorized as employees under the FLSA. As a result, the collective has demonstrated that they were "subjected to some common employer practice that, if proved, would help demonstrate a violation of the FLSA." *Zavala*, 691 F.3d at 538.

Defendants argue to the contrary, highlighting several points of distinction among at least some distributors. As Defendants note, some distributors hired assistants to help with their routes, delivered products for other businesses, or testified that they had some degree of control over the content of their orders. Though these factors are certainly relevant to the employee determination, the variations identified by Defendants pale in comparison to the commonalities. As noted, on the most important aspects of their employment, Plaintiffs have demonstrated that they are similarly or near-identically situated: they make most of their money by servicing large chain accounts, which are closely controlled by Flowers; they all work in the same capacity; and they all signed the same documentation setting forth the expected nature of their relationship with Flowers. Further, while there is some variation on the question of whether distributors did in fact hire assistants, the Distributor Agreements provide that distributors need not serve their routes personally—meaning that Plaintiffs are again similarly situated in that the terms of the working arrangement between Flowers and distributors permitted such hires. Thus the distinctions highlighted by Defendants are insufficient to render the collective dissimilarly situated.

## B. Defendants' Defenses Do Not Defeat the Similarities Among the Collective

Defendants also point to certain defenses they intend to raise: the Motor Carriers Act ("MCA") Exemption and the Outside Sales Exemption. Defendants argue that these defenses must be determined on an individualized basis, and thus preclude final certification.

"FLSA exemptions must be construed narrowly against the employer, and Defendants bear the burden of proving plainly and unmistakably that the drivers qualify for [an] exemption." *Mazzarella v. Fast Rig Support*, LLC, 823 F.3d 786, 790 (3d Cir. 2016) (internal punctuation omitted).

Under the MCA, certain employees are removed from the FLSA's overtime protections. *Resch v. Krapf's Coaches, Inc.*, 785 F.3d 869, 872 (3d Cir. 2015) (quoting 29 U.S.C. § 213(b)(1)). The exemption applies where an employer is a "motor carrier" within the meaning of the statute. *Mazzarella v. Fast Rig Support, LLC*, 823 F.3d 786, 791 (3d Cir. 2016) (internal punctuation omitted). Even if the employer is a motor carrier, however, the MCA does not apply—and thus the FLSA's protections are in full force—if the employee's "job, in whole or in part, affects the safe operation of vehicles lighter than 10,000 pounds, except vehicles designed to transport hazardous materials or large numbers of passengers." *McMaster v. E. Armored Servs., Inc.*, 780 F.3d 167, 169 (3d Cir. 2015). The Third Circuit in *McMaster* declined to define "in part," *id.* at 170 n.4, but other courts within this District have reasoned that "[a]n employee working on a 10,001 pound vehicle two days a week and a 5000 pound vehicle the remaining days of the week appears to satisfy this requirement." *SeYoung Ra v. Gerhard's, Inc.*, 2019 WL 95473, at *8 (E.D. Pa. Jan. 3, 2019) (quoting *Mayan v. Rydbom Express, Inc.*, 2009 WL 3152136, at *9 (E.D. Pa. Sept. 30, 2009)).

Defendants argue that they intend to invoke the MCA, and that this defense will require individualized assessments of whether each member of the collective used a vehicle lighter than 10,000 pounds, and how much time was spent in such a vehicle. Plaintiffs respond that Defendants likely do not qualify as "motor carriers" for this exemption, and that, even if they do, all members of the collective have submitted an answer to an interrogatory indicating that they

use a personal vehicle below the 10,000-pound threshold to complete work for Flowers on the two days out of the week that they perform "pull ups," to adjust stock on shelves. This amount of work in light vehicles is sufficient to defeat application of the MCA. *Id.* Because each member of the collective has provided the same type of evidence indicating the same amount of personal vehicle usage, the members of the collective again are similar situated with regard to the MCA inquiry.

Next, under the Outside Sales Exemption, the FLSA's wages protections "do not apply to workers employed 'in the capacity of outside salesman.'" *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 147 (2012) (quoting 29 U.S.C. § 213(a)(1)). The Department of Labor has defined an "outside salesman" as an employee "[w]hose primary duty is – (i) making sales . . . or (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer." 29 C.F.R. § 541.500. The regulation further provides that "[t]he term 'primary duty' means the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700 (a). While time spent on a particular duty "is not the sole test," it is nonetheless true that "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement." *Id.* at § 541.700(b).

Defendants argue that this exemption, too, will require individualized assessments of the amount of time spent by each member on sales. However, the testimony that Defendants cite indicates that, in a collective of approximately one hundred drivers, four members have brought in a few new accounts, and approximately nine members stated that they had some degree of discretion to modify orders for an existing customer. In contrast, the remaining testimony indicates that distributors are engaged principally in delivering the product to customers. Thus it

is difficult to see how any class member might have a "primary duty" of "making sales" or "obtaining orders or contracts." 29 C.F.R. § 541.500.

Accordingly, for the reasons given, members of the collective are sufficiently "similarly situated" to warrant FLSA final certification.

## III. CLASS ACTION CERTIFICATION

Separately, Plaintiffs move to certify three class actions—one each for violations of the labor laws of three states: Pennsylvania, Maryland, and New Jersey. "Rule 23 class certification and FLSA collective action certification are fundamentally different creatures." *Reinig*, 912 F.3d at 131. While "some of the factors and evidence necessary to satisfy the prerequisites of Rule 23 and § 216(b) [of the FLSA] may overlap," the two standards are not coextensive. *Id.* at 132. Specifically, Rule 23(b)(3) class certification is a higher standard, because Rule 23(b)(3)'s predominance requirement requires a more rigorous showing than the FLSA's "similarly situated" requirement. *See id.* at 131 (referring to the "higher predominance standard" applicable to class action but not FLSA collective).

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Walmart Stores v. Dukes*, 564 U.S. 338, 348 (2011) (internal quotation marks omitted). "To invoke this exception, every putative class action must satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3)." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 590 (3d Cir. 2012). Under Rule 23(a),

> (1) the class must be "so numerous that joinder of all members is impracticable" (numerosity); (2) there must be "questions of law or fact common to the class" (commonality); (3) "the claims or defenses of the representative parties" must be "typical of the claims or defenses of the class" (typicality); and (4) the named plaintiffs must "fairly and adequately protect the interests of the class" (adequacy of representation, or simply adequacy).

*In re Cmty. Bank of N. Va.*, 622 F.3d 275, 291 (3d Cir. 2010) (quoting Fed. R. Civ. P. 23).

Plaintiffs must also satisfy one of the subsections of Rule 23(b). Rule 23(b)(3), the primary basis

asserted for certification here, "requires that (i) common questions of law or fact predominate

(predominance), and (ii) the class action is the superior method for adjudication (superiority)."

*Marcus*, 687 F.3d at 591 (internal quotation marks omitted). In addition, Plaintiffs also passingly

propose certification under Rule 23(b)(2), which permits certification where "the party opposing

the class has acted or refused to act on grounds that apply generally to the class, so that final

injunctive relief or corresponding declaratory relief is appropriate respecting the class as a

whole." Fed. R. Civ. P. 23(b)(2).

Plaintiffs must demonstrate that certification is proper by showing by a preponderance

that the requirements of Rule 23 are satisfied. *See Reinig*, 912 F.3d 125. "When conducting the

Rule 23 analysis, [the Third Circuit has] instructed that district courts [must] resolve all factual

or legal disputes relevant to class certification, even if they overlap with the merits—including

disputes touching on the elements of the plaintiffs' claims." *Id.* (internal punctuation omitted).

Nonetheless, "the class certification stage is not the place for a decision on the merits." *Williams*

*v. Jani-King of Phila. Inc.*, 837 F.3d 314, 322 (3d Cir. 2016).

> The three classes that Plaintiffs seek to certify here are defined as:
>
> All persons who, at any time from December 1, 2012 continuing through entry of
> judgment in this case, worked as distributors for Flowers Foods, Inc. and/or
> Flowers Baking Company of Oxford, Inc., in [Pennsylvania, Maryland, or New
> Jersey] and were classified as independent contractors under their distribution
> agreements.

On behalf of each class, Plaintiffs assert that Defendants violated the respective state's labor

laws principally by failing to pay overtime and taking improper deductions. Because the

analysis applicable to each state class is often equally applicable to the other classes, the three

classes are analyzed together.

## A. Rule 23(a) Factors

### i. *Numerosity*

The numerosity requirement is met where "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "While no minimum number of plaintiffs is required to maintain a suit as a class action," as a general rule, "if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 249-50 (3d Cir. 2016), *as amended* (Sept. 29, 2016) (internal punctuation omitted). "At the other end of the spectrum, . . . a class of fifteen [is likely] too small to meet the numerosity requirement." *Id.* (internal quotation marks omitted). Where the number of potential class members falls somewhere in between, the Third Circuit has instructed the "inquiry into impracticability [of joinder] should be particularly rigorous." *Id.* The Third Circuit has listed several factors to consider in undertaking this analysis: "judicial economy, the claimants' ability and motivation to litigate as joined plaintiffs, the financial resources of class members, the geographic dispersion of class members, the ability to identify future claimants, and whether the claims are for injunctive relief or for damages." *Id.* at 253. "While all factors are relevant, . . . not all are created equal. Instead, both judicial economy and the ability to litigate as joined parties are of primary importance." *Id.*

Plaintiffs have identified at least 64 individuals that meet the criteria of the Pennsylvania class and 83 that meet the criteria of the Maryland class. Joinder of this many individual claims would be highly impractical. Accordingly, this prong is satisfied as to the Pennsylvania and Maryland classes.

With regard to the New Jersey class, Plaintiffs have identified at least 28 individuals.

Because this number falls under 40 but above 15, closer examination is warranted. Nonetheless, an analysis of the factors set out by the Third Circuit demonstrates that numerosity is satisfied. Individual actions of 28 highly similar claims, which turn largely on the common proof (as explained in greater detail in the predominance section, below), would present considerable inefficiency. There would also be significant docket congestion from individual joinder of class members, with each needing to find and enter representation. To date, there has already been significant difficulty in communicating with some individual members of the FLSA collective, which has delayed receipt of discovery and adjudication of pending motions. Further, the class members are distributors that do not have large financial resources—thus their ability to litigate independently is limited. In the absence of class certification, the difficulties inherent in dealing with each individual class members would only mount. Accordingly, numerosity is satisfied as to the New Jersey class as well.

### ii. Commonality

The commonality requirement is met where "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Rule 23(a)(2)'s commonality requirement does not require identical claims or facts among class members." *Marcus*, 687 F.3d at 597 (internal punctuation omitted). "For purposes of Rule 23(a)(2), even a single common question will do." *Id.* Here, the named plaintiffs for each state class and all class members work in the same capacity, as distributors; have signed Distributor Agreements; perform the same functions; and are subject to many of the same Flowers policies. Further, they advance the same legal claims under their respective state's laws. Accordingly, commonality is satisfied.

### iii. Typicality

The typicality requirement is met where "the claims or defenses of the representative

parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The concepts of typicality and commonality are closely related and often tend to merge." *Marcus*, 687 F.3d at 597. "Typicality, however, derives its independent legal significance from its ability to screen out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present." *Id.* at 598. "To determine whether a plaintiff is markedly different from the class as a whole, [courts] consider the attributes of the plaintiff, the class as a whole, and the similarity between the plaintiff and the class." *Id.* "This comparative analysis addresses three distinct, though related, concerns: (1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class." *Id.* "If a plaintiff's claim arises from the same event, practice or course of conduct that gives rises to the claims of the class members, factual differences will not render that claim atypical if it is based on the same legal theory as the claims of the class." *Id.*

Matthew Carr and Terry Carr are the named plaintiffs for the Pennsylvania class; David Tumblin and Gregory Brown for Maryland; and, finally, Luke Boulange for New Jersey. In each case, the named plaintiffs advance the same legal theory as the other members of their class, and have similar factual circumstances to the other members, in that they each have worked for Flowers as distributors in their respective states. None appear to be subject to a defense broadly inapplicable to other members of the class. Finally, their interests are sufficiently aligned with

that of the class, because they and the class seek the wage and hour protections of their respective state laws, and there is no indication that their claims are in any way antagonistic to other members of the class. Accordingly, typicality is satisfied.

### iv. Adequacy

Defendants do not make any argument that adequacy is not satisfied. Indeed, that is because the adequacy requirement is met, in that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement "has two components": "[f]irst, the adequacy inquiry tests the qualifications of the counsel to represent the class"; and, "[s]econd, it seeks to uncover conflicts of interest between named parties and the class they seek to represent." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 532 (3d Cir. 2004) (internal citations and quotation marks omitted). "[T]he linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *In re Cmty. Bank of N. Va.*, 795 F.3d at 393. "[C]lass counsel may not . . . represent an entire class if subgroups within the class have interests that are significantly antagonistic to one another." *Id.*

Counsel for Plaintiffs have submitted materials detailing their litigation experience, and specifically their work in class actions and employment litigation. Further, the named plaintiffs and members of the class "are all pursuing damages under the same statutes and the same theories of liability, and the differences among them will not, at least as things presently stand, pit one group's interests against another." *Id.* at 394. "There is thus no fundamental intra-class conflict to prevent class certification, nor is there any derivative conflict of interest that would prevent counsel from fairly and adequately representing the interests of the entire class." *Id.* at 394-95. Accordingly, this factor is met.

## B. Rule 23(b) Requirements

In addition to satisfying the strictures of Rule 23(a), Plaintiffs must also satisfy the requirements of one of the subsections of Rule 23(b).  Plaintiffs assert that certification is warranted under both Rule 23(b)(3), which permits certification where common questions predominate, and Rule 23(b)(2), which permits certification where declaratory or injunctive relief is appropriate as to the class as a whole.  The parties focus on Rule 23(b)(3), and thus the analysis begins there.

### i.  *Rule 23(b)(3)—Preliminary Note on Ascertainability*

Though not an explicit requirement of Rule 23, "an essential prerequisite of a class action, at least with respect to actions under Rule 23(b)(3), is that the class must be currently and readily ascertainable based on objective criteria."  *Marcus*, 687 F.3d at 592-93.  "The class definition must be clear in its applicability so that it will be clear later on whose rights are merged into the judgment, that is, who gets the benefit of any relief and who gets the burden of any loss." *Id.* at 593.

Plaintiffs seek to certify three classes of distributors who "worked . . . in" the Commonwealth of Pennsylvania, in the State of Maryland, or in the State of New Jersey, and were classified as independent contractors under their distributor agreements.  Determining here whether a particular individual "worked . . . in" a particular state as specified in the class definitions is "readily ascertainable based on objective criteria," because distributors work out of specified warehouses and within fixed geographic areas, which are documented clearly in Flowers' records.  *Id.* at 592-93.  The next qualification is that a driver be classified as an independent contractor in their Distributor Agreement—a fact which is immediately apparent from the face of the contract.  Accordingly, ascertainability is satisfied.

It is true, as Defendants point out, that approximately forty members of the three state classes work across state lines, operating in geographic areas covering both New Jersey and Pennsylvania, for example, or Maryland and Virginia. This fact, however, does not undermine ascertainability: distributors' warehouse and route locations will make clear whether they "worked . . . in" a particular state, as required by the class definition. That is to say, a distributor who makes deliveries in both Maryland and Virginia plainly "work[s] . . . in" Maryland, and thus meets the definition of the Maryland class. Defendants argue, however, that some distributors may do insufficient work in a given state to qualify for the wage protections of that state—and that any determination of whether a given distributor qualifies for the protections of the wage laws of a given state will necessitate a highly individualized inquiry. Thus the concern raised by Defendants is not that the classes lack ascertainability—but instead that the processing of sorting out whether a given distributor may maintain a claim under the law of a particular state demands individual treatment.

True enough, for the forty or so individuals that worked across state lines, some degree of individualized inquiry will be necessary. But, contrary to Defendants' assertion, this will be a relatively straightforward inquiry. The availability of Pennsylvania, Maryland, and New Jersey wage protection laws turns largely on geographic considerations. Maryland's highest court has construed its jurisdiction broadly, and courts have found that individuals may assert Maryland wage claims so long as they perform "some work" in Maryland. *See Cunningham v. Feinberg*, 107 A.3d 1194, 1218 (Ct. App. Md. 2015) ("Maryland is willing generally to allow itself to be used as a forum by workers seeking recovery of their wage claims," even where employment has out-of-state ties); *see also Hausfeld v. Love Funding Corp.*, 131 F. Supp. 3d 443, 455 (D. Md. 2015) (individual need only perform "some work" in Maryland to assert MWPCL claim). While

there does not appear to be settled law regarding the application of Pennsylvania or New Jersey

wage laws to plaintiffs who work across state lines, courts considering the limits of those states'

protections have asked whether an individual is "based in" that state, looking to the individual's

physical presence in and contact with the forum. *See, e.g.*, *McGoldrick v. TruePosition, Inc.*, 623

F. Supp. 2d 619, 631 (E.D. Pa. 2009) ("[P]rotections contained in the WPCL extend only to

those employees based in Pennsylvania."); *Lupian v. Joseph Cory Holdings, LLC*, 240 F. Supp.

3d 309, 313 (D.N.J. 2017) ("The few courts that have considered the issue have all held that the

NJWPL does not apply to employees based outside of New Jersey.") (internal quotation marks

omitted). Accordingly, for the forty or so distributors that work across state lines, the question

will be whether they perform enough work in a given state to be fairly considered to do "some

work" or be "based" there. This inquiry will not be onerous: distributors operate out of a single,

fixed warehouse—which is the focal point of their work, where they collect product and interact

with Flowers sales managers—and deliver product within a single, fixed geographic area.

Accordingly, while some individual inquiry will be required to determine whether the forty

interstate drivers may assert claims under the laws of a particular state, it will turn largely on

relatively straightforward assessments of where their warehouse is, and how much of their route

is in a given state.

Defendants also argue that choice of law provisions in the Distributor Agreements

designate numerous different states (including neighboring states, and some as far flung as

Kentucky), and thus the law applicable to Plaintiffs' claims will vary widely. Effectively, they

assert that distributors may only assert wage claims under the wage protection statutes of the

states named in the choice of law provisions. However, states' interests in protecting their

workers often override the choice of law provision in determining which state's wage protection

laws apply. *See Cunningham*, 107 A.3d at 1216 (expressing concern that "federal courts [that] continue, it seems, to hold that the MWPCL does not apply when parties choose another state's law in a choice of law clause"); *see also Kruzits v. Okuma Mach. Tool, Inc.*, 40 F.3d 52, 55 (3d Cir. 1994) (suggesting that, where employee protection statutes are at issue, choice of law provisions in employment contracts may give way, in light of states' strong interest in enforcing their statutes); *Lupian*, 240 F. Supp. 3d at 313 (declining to enforce New Jersey choice of law provision to Illinois workers' wage claims). Further, using a choice of law provision to determine whether an individual may assert a particular state's statutory wage claim makes scant sense: "[wage] claims are statutory, rather than contractual, in nature," and generally do not require "the Court to resolve any issues of construction or interpretation regarding the contracts that Plaintiffs signed." *Sigala v. ABR of VA, Inc.*, 2016 WL 1643759, at *5-*6 (D. Md. Apr. 21, 2016).

Even setting these considerations aside, the choice of law provisions here are too narrow to control disputes that do not arise directly from the contract. When a federal court is sitting in diversity, the choice of law rules of the forum state—in this case, Pennsylvania—apply. *Specialty Surfaces Int'l, Inc. v. Cont'l Cas. Co.*, 609 F.3d 223, 229 (3d Cir. 2010). While "Pennsylvania courts generally honor a parties' choice of law provision" such a provision "only governs claims arising from the contract unless the provision suggests the parties intended it to govern all aspects of their association." *Vino 100, LLC v. Smoke on the Water, LLC*, 2011 WL 2604338, at *7 (E.D. Pa. July 1, 2011). "Courts analyze choice of law provisions to determine, based on their narrowness or breadth, whether the parties intended to encompass all elements of their association." *Jiffy Lube Int'l, Inc. v. Jiffy Lube of Pennsylvania, Inc.*, 848 F. Supp. 569, 576 (E.D. Pa. 1994).

Here, the choice of law provision extends only to "[t]his [Distributor] Agreement and the construction thereof." Looking to Pennsylvania law, this provision is narrow—it applies only to the agreement itself and its construction, and "does not attempt to define the law that will govern all of the parties' legal relations." *Vino 100*, 2011 WL 2604338, at *7; *see also Smith v. Lincoln Ben. Life Co.*, 2009 WL 789900, at *7 (W.D. Pa. Mar. 23, 2009) (choice of law provision "limited to 'this policy,'" found to be "narrow"). Accordingly, the choice of law provision "only governs claims arising from the contract." *Vino 100*, 2011 WL 2604338, at *7.

Plaintiffs' claims are that Defendants have violated the statutory law of Pennsylvania, Maryland, and New Jersey. Thus their claims are not "based on contractual duties" created by the Distributor Agreements, and do not arise under the contract. *Vino 100*, 2011 WL 2604338, at *8. Indeed, Plaintiffs assert that the Distributor Agreements are incorrect, insofar as the agreements label them independent contractors rather than employees. *See Williams*, 837 F.3d at 323 (observing that "labels used in an agreement . . . are not determinative" of statutory employee status; courts instead must examine nature of employment) (emphasis omitted). While Plaintiffs intend to use the Distributor Agreements to provide evidence of Flowers' general policies towards distributors, their claims do not rely on the contracts to establish the legal obligations of the parties. *See id.* ("[P]rovisions of an agreement may be evidence of what the actual practice or working relationship is."). Accordingly, the choice of law provisions do not control the substantive law applicable to Plaintiffs' claims. *See id.* (holding that contractual choice of law provision did not control statutory claim for deceptive practices); *see also Sigala*, 2016 WL 1643759, at *5-*6.

As a result, ascertainability as to all three classes is satisfied.

## ii.       *Rule 23(b)(3)—Predominance*

"Rule 23(b)'s predominance requirement incorporates Rule 23(a)'s commonality requirement because the former, although similar, is far more demanding than the latter." *Reinig*, 912 F.3d at 127 (internal quotation marks omitted).  "Like the commonality requirement, predominance tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Id.* (internal punctuation omitted).  "However, the predominance requirement imposes a more rigorous obligation upon a reviewing court to ensure that issues common to the class predominate over those affecting only individual class members."  *Id.* (internal quotation marks omitted).

"When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members."  *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (internal quotation marks omitted).  The predominance requirement "does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof."  *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013) (internal punctuation omitted).   Nonetheless, "[a]t the class certification stage, the predominance requirement is met only if the district court is convinced that the essential elements of the claims brought by a putative class are capable of proof at trial through evidence that is common to the class rather than individual to its members."  *Reinig*, 912 F.3d at 127 (internal quotation marks omitted).  "In practice, this means that a district court must look first to the elements of the plaintiffs' underlying claims and then, through the prism of Rule 23, undertake a rigorous assessment of the available evidence and the method or methods by which

the plaintiffs propose to use the evidence to prove those elements." *Id.* at 128 (internal

punctuation omitted). "If proof of the essential elements of the claim requires individual

treatment, then class certification is unsuitable." *Id.*

On behalf of the state classes, Plaintiffs bring claims for violations of the respective

state's wage laws, for failure to pay overtime and for improper pay deductions, as well as other

record-keeping related issues. Predominance is analyzed with respect to each claim. Though the

laws vary in their particulars, the threshold question in each case is whether distributors are

properly classified as employees or independent contractors under the specific test applicable to

that law. Because both the Pennsylvania Minimum Wage Act and the Maryland Wage and Hour

Law incorporate the standards of the FSLA, those claims are analyzed together.

> a. Pennsylvania Minimum Wage Act Claim and Maryland Wage and Hour Law
> <u>Claims</u>

Plaintiffs seek a declaration that the Pennsylvania and Maryland distributors are properly

classified as employees under the PMWA and MWHL, respectively. Both the PMWA and the

MWHL incorporate the "economic realities" test of the FLSA to determine employee status. *See*

*Com., Dep't of Labor & Indus. v. Stuber*, 822 A.2d 870, 873 (Pa. Commw. 2003), *aff'd*, 859

A.2d 1253 (Pa. 2004) (PMWA); *see also Newell v. Runnels*, 967 A.2d 729, 771 (Ct. App. Md.

2009) (MWHL). Plaintiffs also bring claims for damages, alleging that, because the

Pennsylvania and Maryland distributors are employees, Flowers violated the PMWA and

MWHL principally by failing to pay overtime.

As discussed above in the FLSA setting, to determine whether an individual is an

employee or independent contractor under the FLSA economic realities test, courts examine:

> 1) the degree of the alleged employer's right to control the manner in which the
> work is to be performed; 2) the alleged employee's opportunity for profit or loss
> depending upon his managerial skill; 3) the alleged employee's investment in

equipment or materials required for his task, or his employment of helpers;
4) whether the service rendered requires a special skill; 5) the degree of
permanence of the working relationship; 6) whether the service rendered is an
integral part of the alleged employer's business.

*Martin*, 949 F.2d at 1293.  The inquiry does not look to "isolated factors but rather upon the

'circumstances of the whole activity,'" and thus "neither the presence nor the absence of any

particular factor is dispositive."  *Id.*

The commonalities and uniformities among the Plaintiffs that were sufficient for the

FLSA claim also demonstrate that common questions predominate in determining employee

status here, because the common core of evidence bearing on the employment factors renders the

misclassification claims susceptible to class-wide resolution.

*The degree of the alleged employer's right to control the manner in which the work is to*

*be performed*.  In support of their motions, Plaintiffs cite the documentary evidence regarding

Flowers' management of distributors as undergirding its case that Flowers hold the right to

control the distributors' work.  The Distributor Agreements set forth the intended terms of the

relationship between Flowers and distributors, stipulating, for example, that distributors must

cooperate with Flowers' pricing and promotional efforts, as well as reserving to Flowers the right

to add or drop accounts from distributors' route areas, and issue breach letters when Flowers

perceives a distributor's work to be lacking.  The right to control inquiry will also be informed

by Flowers' policies towards its large chain customers, given that Flowers closely manages, *inter*

*alia*, pricing and customer expectations with regard to those accounts, which, in turn, make up

the majority of distributors' sales.  The common training program and common discipline and

oversight regime will also bear on this inquiry.  Taken together, this common evidence could be

taken to establish that Flowers exercises a high degree of control over distributors' work.

*The alleged employee's opportunity for profit or loss depending upon his managerial*

*skill*.  This too is susceptible to class-wide proof, largely because of the outsize role of the large chain accounts in generating distributors' income.  Given that the parties agree that distributors exercise little to no discretion over these accounts, and that these accounts make up the majority of distributors' sales, common evidence regarding Flowers' management of these accounts will weigh heavily on this analysis.  This factor will also be informed by the terms of the Distributor Agreements, which indicate that Flowers may set prices and add or drop accounts.  Finally, common evidence of Flowers' practices in issuing suggested orders, and setting the terms for the repurchase of stale product will also bear on this inquiry.

*The alleged employee's investment in equipment or materials required for his task*.  The Distributor Agreements again provide common evidence on this factor, by setting out the expectations on whether distributors will purchase their own trucks.  Further, common evidence of accounts' typical delivery requirements also will bear on this inquiry, given that, as a general matter, distributors are obligated to perform "pull ups" to adjust stock on shelves two days a week, and distributors use their personal vehicles to perform this task.  It does appear that there is more variation among distributors as to their particular experiences on this factor than on others, given that some members use trucks that are financed independently of Flowers, while in other cases Flowers has a large role in procuring the delivery truck.  Nonetheless, in light of the common evidence of expectations set out by the Distributor Agreement, and the typical delivery patterns involving personal vehicles, this factor will largely turn on common evidence.

*Employment of helpers*.  Here, too, there is some degree of variation among distributors' experiences: some hired helpers, others did not.  But again, the provisions of the Distributor Agreements set out expectations common to the class by providing that deliveries need not be "conducted personally," and distributors are "free to engage" any outside assistance that they

"deem appropriate." Thus common evidence bears on this inquiry because the documentary evidence shows the uniform expectation that distributors would have discretion to hire assistants.

*Whether the service rendered requires a special skill*. This inquiry will necessarily turn on common evidence regarding distributors' role. Each distributor worked in the same capacity, and underwent the same Flowers training program.

*The degree of permanence of the working relationship*. Once again, the Distributor Agreements will be key to this inquiry, since they provide for an ongoing working relationship, with no specified end date, and set forth the termination rights of each party.

*Whether the service rendered is an integral part of the alleged employer's business*. This, too, will necessarily turn on common evidence, since Plaintiffs worked in the same capacity for Flowers and provided the same function in Flowers' business.

Thus, the FLSA economic realities test will turn largely on common evidence to establish the "circumstances of the whole activity." *Martin*, 949 F.2d at 1293. Though there is some variation among distributors' actual experiences which bears on certain factors, the classification inquiry does not look to "isolated factors" and thus "neither the presence nor the absence of any particular factor is dispositive." *Id.* Plaintiffs have demonstrated that they are near-identically situated with regard to the most important aspects of their relationship with Flowers. And, because the majority of the factors are clearly susceptible to class-wide proof based on these similarities, the PMWA and MWHL misclassification claims are amenable to class-wide resolution.[3] *See Williams*, 837 F.3d at 322 (where "it is possible to make [employee

---

[3] Defendants repeat their arguments about the MCA and Outside Sales Exemptions in their arguments against class certification. But, as discussed above with regard to FLSA certification, little individualized inquiry is necessary to resolve those defenses. Accordingly, any application of these exemptions does not defeat the predominance of the common questions of law and fact presented by Plaintiffs.

classification] determination on a class-wide basis" using common evidence, predominance is satisfied).  In sum, commonalities among distributors—regarding Flowers' management of the large chain accounts, its training, discipline, and shelf organization policies, and the expectations of distributors' role and responsibility as set out in the Distributors Agreements—will predominate in determining whether, "as a matter of economic reality," distributors are "dependent upon" Flowers.  *Martin*, 949 F.2d at 1293.

Plaintiffs also bring damages claims under both the PWMA and MWHL, for failure to pay overtime.  To prove liability in such claims, "Plaintiffs must prove that they worked more than 40 hours a week without adequate compensation." *See Williams v. Sweet Home Healthcare, LLC*, 325 F.R.D. 113, 129 (E.D. Pa. 2018).  This inquiry is susceptible to class-wide proof. Plaintiffs have proffered evidence from Flowers representatives that, for most accounts, distributors were obligated to make deliveries five days out of the week, and perform "pull ups" to organize stock on the other two days.  These deliveries and "pull ups" generally occurred during regularly scheduled hours, which were fixed according to customer needs.  Further, records retained by Defendants attest to distributors' delivery schedules.  The Flowers-issued handheld computers logged distributors' deliveries and end-of-day returns to the Flowers warehouse, while the weekly settlement authorizations also reflect delivery activity.  Plaintiffs intend to offer expert testimony analyzing and interpreting these records.  Accordingly, common proof—namely, the delivery and "pull up" requirements, as well as documentary evidence regarding distributors' work—will predominate in assessing whether Defendants required the Pennsylvania and Maryland classes to work in excess of 40 hours a week without overtime pay.

Defendants argue to the contrary that overtime hours will require highly individualized assessments of how much any given distributor worked and whether that distributor's work was

partially allocated to an assistant.  It is true that, ultimately, to assess damages, individualized inquiry will likely be needed—but such individualized damages assessments do not undermine the case for certification.  *See, e.g.*, *Sweet Home Healthcare*, 325 F.R.D. at 129; *Sherman v. Am. Eagle Exp., Inc.*, 2012 WL 748400, at *10 (E.D. Pa. Mar. 8, 2012); *see also Tyson*, 136 S. Ct. at 1045 (certification under Rule 23(b)(3) may be appropriate "even though other important matters will have to be tried separately, such as damages").

Further, Defendants' reliance on *Diabate v. MV Transp., Inc.*, 2015 WL 4496616, at *11-*13 (E.D. Pa. July 20, 2015), where this Court declined to certify a class asserting overtime violations, is misplaced.  There, a putative class of overtime plaintiffs had presented evidence reflecting a "broad, nearly inexplicable range of scenarios" among the class members.  *Id.* at *12.  Thus the plaintiff had failed to establish "how she would prove *liability*" on the overtime claim.  *Id.* at *13 (emphasis added).  Here, by contrast, the Distributors have presented evidence applicable to the entire class regarding delivery and pull-up requirements seven days per week and related records retained by Defendants.  Thus, here, common proof will predominate in the overtime *liability* inquiry of whether Defendants required the class to work more than forty hours per week.  *Cf. Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 380 (7th Cir. 2015) (certification appropriate where overtime plaintiffs allege that defendant organization had a policy or practice of requiring overtime work, despite potential that individual plaintiffs did not work over forty hours).

Accordingly, the predominance requirement is satisfied as to Plaintiffs' PMWA and MWHL claims.

      b.  <u>Pennsylvania Wage Payment and Collection Law Claims</u>

On behalf of the Pennsylvania class, Plaintiffs seek a declaration that they are properly

considered employees under the PWPCL, and damages for violating the PWPCL principally by improper deductions. "The [P]WPCL requires employers, among other things, to pay to employees wages and agreed-upon fringe benefits in a regularly scheduled manner and by lawful money or check and to make only lawful deductions from employees' pay," but does not define who is and who is not an employee. *Williams*, 837 F.3d at 319-20. To differentiate between employees and independent contractors under the PWPCL, the Third Circuit recently looked to the following factors:

> [T]he control of the manner that work is to be done; responsibility for result only; terms of agreement between the parties; the nature of the work or occupation; the skill required for performance; whether one employed is engaged in a distinct occupation or business; which party supplies the tools; whether payment is by the time or by the job; whether the work is part of the regular business of the employer, and the right to terminate the employment at any time.

*Id.* "[N]o factor is dispositive," *id.*, but, importantly, "the right to the right to control, rather than actual control, is the most important of the factors," *id.* at 321.

In *Williams*, the Third Circuit found that common evidence in the form of franchise agreements and other documents regarding company policies provided sufficient evidence of employee status under the PWPCL to render class certification appropriate. The documents "describe[d] the level of [the putative employer's] right to control its franchisees," and "address[ed] many of the secondary factors considered in Pennsylvania decisions—the terms of agreement, the nature of the work, the skill required, who supplies the tools, whether payment is by time or by job, and the right to terminate at any time." *Id.* at 322. Because the documents touched on many aspects of the employee test, the Third Circuit reasoned that such documents "could be read" to establish that the plaintiffs were employees under the PWPCL. *Id.* Thus, the central question—whether the plaintiffs had been misclassified under the PWPCL—was provable on a class-wide basis through the common documentary evidence.

Here, as in *Williams*, the central classification issue is provable on a class-wide basis through common evidence. As discussed above, the right to control is susceptible to class-wide proof, based on the Distributor Agreements and Flowers' common policies regarding the large chain accounts, training, and oversight. As to "responsibility for result only," *id.* at 321, this too may be established through common evidence of distributors' role, as envisioned by the Distributor Agreements and as practiced with regard to the large chain accounts. Several additional factors will largely turn on the common evidence established in the Distributor Agreements and the settlement statements—namely, the "terms of agreement between the parties," "the right to terminate the employment at any time," "whether payment is by the time or by the job." *Id.* And, because Plaintiffs all work in the same capacity, common evidence will necessarily establish "the nature of the work or occupation," "the skill required for performance," and "whether the work is part of the regular business of the employer." *Id.* Thus, given that the most important factor in the PWPCL test—the right to control—as well as the balance of the remaining factors are susceptible to class-wide proof, Plaintiffs' employee status may be determined on a class-wide basis.

In addition to asserting their misclassification claim, Plaintiffs also bring a damages claim for violations of the PWPCL. Plaintiffs principally contend that Flowers improperly took deductions from their pay, and further allege that Flowers failed to pay members for all hours worked and failed to provide required notices regarding compensation.

The PWPCL was enacted "to provide employees with a statutory remedy when an employer breaches its contractual obligation to pay wages." *Ely v. Susquehanna Aquacultures, Inc.*, 130 A.3d 6, 13 (Pa. Super. 2015). The contractual obligation may be express or implied. See *Rapczynski, et al. v. DIRECTV, LLC, & Mastec N. Am., Inc.*, 2016 WL 1071022, at *8-9

(M.D. Pa. Mar. 17, 2016); *see also Braun v. Walmart Stores, Inc.*, 24 A.3d 875, 954 (Pa. Super. 2011), *aff'd*, 106 A.3d 656 (Pa. 2014). The PWPCL requires that,

> Every employer shall pay all wages, other than fringe benefits and wage supplements, due to his employes on regular paydays designated in advance by the employer.... The wages shall be paid in lawful money of the United States or check, except that deductions provided by law, or as authorized by regulation of the Department of Labor and Industry for the convenience of the employe, may be made including deductions of contributions to employe benefit plans which are subject to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.*[4]

43 P.S. § 260.3. A list of deductions authorized by law is codified at 34 Pa. Code § 9.1, the last of which is a catch-all category allowing "other deductions authorized in writing by employes as in the discretion of the Department [of Labor and Industry are found to be] proper and in conformity with the intent and purpose of the [PWPCL]." 34 Pa. Code § 9.1(13). Even where an employer obtains written authorization from its employees to make certain deductions, the employer must also obtain approval for the deductions from the Department of Labor and Industry in order to comply with the PWPCL. *See Ressler v. Jones Motor Co.*, 487 A.2d 424, 427-28 (Pa. Super. 1985).

Whether Flowers violated the PWPCL is susceptible to class-wide proof. Because Plaintiffs assert that the same agreements and practices governed their earnings from Flowers, the inquiry of whether a contractual obligation to pay wages existed may be shown through common evidence such as the Distributor Agreements and the weekly settlement agreements. Further, Plaintiffs assert that their claim turns on categorical deductions that Defendants routinely take out of distributors' pay, which can be demonstrated through the weekly settlement agreements and Defendants' internal records regarding the various categories of deductions.

---

[4] The PWPCL and related regulations use the words "employe" and "employes" rather than "employee" and "employees."

Defendants do not dispute that the deductions are categorical in nature, nor do they dispute Plaintiffs' characterization of the documents underlying the deductions. Accordingly, because the same categories of deductions were routinely made by Defendants and subjected to the same treatment in the standard written agreements between the parties, the validity of those deductions will hinge on common questions of law—namely, whether particular categories of deductions were proper under the PWPCL's implementing regulations or other authorization from the Department of Labor and Industry. As a result, whether these categories were permissible under the PWPCL is susceptible to class-wide proof.

Defendants argue to the contrary that the deductions were all authorized individually in writing by distributors, and Plaintiffs may seek to dispute those authorizations by raising individualized contract defenses, like duress. But Plaintiffs have not indicated that they intend to pursue such individualized theories. Thus there is no indication that individual questions regarding a particular authorization will be presented. And, given the predominance of the common questions regarding the general, legal validity of the categories of deductions, certification remains appropriate even if such individualized issues arise. *See Tyson Foods*, 136 S. Ct. at 1045 ("When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.") (internal quotation marks omitted).

Accordingly, both the declaratory misclassification claim and damages claim under the PWPCL are susceptible to class-wide determination, and predominance is satisfied as to these claims.

c. <u>Maryland Wage and Payment Collection Law Claims</u>

On behalf of the Maryland class, Plaintiffs seek a declaration that they are properly considered employees under the MWPCL, and damages for violating the MWPCL. Plaintiffs assert that Flowers violated the MWPCL principally by failing to properly pay members for all hours worked and improperly taking deductions from their pay. The MWPCL "requires employers to establish regular pay periods" and "prohibits employers from making unauthorized deductions." *Friolo v. Frankel*, 819 A.2d 354, 362 (Md. Ct. App. 2003). Further, "both the [M]WHL and the [M]WPCL are vehicles for recovering overtime wages." *Peters v. Early Healthcare Giver, Inc.*, 97 A.3d 621, 625-26 (Md. Ct. App. 2014).

As with the other statutes at issue here, to qualify for the MWPCL's protections, an individual must be an employee. The parties contest whether the MWPCL looks to either the FLSA's economic realities test or the common law master servant test to determine employee status. The tests are similar, but the Maryland Court of Appeals has specifically instructed that, to determine employee or independent contractor status under the MWPCL, the following factors must be considered:

> 1. Whether the employer actually exercised or had the right to exercise control over the performance of the individual's work; 2. Whether the individual's service is either outside all the usual course of business of the enterprise for which such service is performed; 3. Whether the individual is customarily engaged in an independently established trade, occupation, profession, or business; 4. Whether it is the employer or the employee who supplies the instrumentalities, tools, and location for the work to be performed; 5. Whether the individual receives wages directly from the employer or from a third party for work performed on the employer's behalf; and 6. Whether the individual held an ownership interest in the business such that the individual had the ability and discretion to affect the general policies and procedures of the business.

*Baltimore Harbor Charters, Ltd. v. Ayd*, 780 A.2d 303, 318-19 (Ct. App. Md. 2001).[5] Further,

---

[5] In *Campusano v. Lusitano Const. LLC*, the Maryland Court of Special Appeals imported the FLSA's economic realities test to an MWPCL claim—but did so in order to define an *employer* for purposes of ascertaining whether a manager could be held personally liable, not an *employee* as compared to an independent contractor, which is the

there is an "emphasis on the right to exercise control" which looks to "whether [the employer] could have exercised control over [the worker], not whether he actually did." *Id.* at 319.

Once again, common questions will predominate over individual inquiries in applying these factors to the Maryland class. As was the case with the PWPCL claim, the focus in resolving this claim will be on the right to control—which may be proven through the common evidence regarding the Distributor Agreements, the large chain accounts, and the prevailing training and discipline policies. Further, because the Maryland distributors each worked under the same strictures and in the same capacity, common evidence will resolve the questions of "[w]hether the individual's service is either outside all the usual course of business of the enterprise for which such service is performed," "[w]hether the individual receives wages directly from the employer or from a third party for work performed on the employer's behalf," and "[w]hether the individual held an ownership interest in the business such that the individual had the ability and discretion to affect the general policies and procedures of the business." Accordingly, because the most important factor—right to control—is provable through common evidence, as are the balance of the remaining factors, the MWPCL misclassification claim is susceptible to class-wide determination.

As with the above class claims, the next question is whether the damages claims for violations of the MWPCL are similarly susceptible to class-wide proof. As above, Plaintiffs' overtime claims are susceptible to class-wide proof through common evidence regarding distributors' delivery requirements. As to deductions, under the MWPCL, a deduction is permitted if it is:

> (1) ordered by a court of competent jurisdiction: (2) authorized expressly in
> writing by the employee; (3) allowed by the Commissioner because the employee

question here. 56 A.3d 303, 308 (Ct. Sp. App. Md. 2012). Indeed, the court specifically left intact the Maryland Court of Appeals' definition of *employee*, which looks to the common law. *See id.* at 308 n.5.

38

has received full consideration for the deduction; or (4) otherwise made in
accordance with any law or any rule or regulation issued by a governmental unit.

Md. Code Ann., Lab. & Empl. § 3-503; *see also Cunningham v. Feinberg*, 107 A.3d 1194, 1202

(Md. Ct. App. 2015). Again, the same *categories* of deductions were routinely made by

Defendants, and subjected to the same treatment in standard written agreements between the

parties. As a result, whether these categories were encompassed by those agreements—and thus

were routinely "authorized expressly in writing" by employees, *id.*—is susceptible to class-wide

proof.

Accordingly, the predominance requirement is satisfied as to the MWPCL claims.

d. New Jersey Wage and Payment Law and New Jersey Wage and Hour Law Claims

Plaintiffs advance two types of claims under New Jersey labor law: violations of (1) the

NJWHL, for failure to pay overtime; and (2) the NJWPL, for failure to pay all wages due and

making impermissible deductions. [6]

In 2015, the New Jersey Supreme Court held that the "ABC" test, would govern

employment status determinations under both the NJWPL and the NJWHL. *See Hargrove v.

Sleepy's, LLC*, 106 A.3d 449, 463 (N.J. 2015); *see also Hargrove v. Sleepy's LLC*, 612 F. App'x

116, 118 (3d Cir. 2015). Under the ABC test,

[W]orkers performing services for a given company in exchange for pay are
deemed employees *unless* the company can demonstrate *each* of the following:

A. Such individual has been and will continue to be free from control or
direction over the performance of such service, both under his contract of
service and in fact; and
B. Such service is either outside the usual course of the business for which
such service is performed, or that such service is performed outside of all
the places of business of the enterprise for which such service is

---

[6] The New Jersey claims were initially filed as a separate suit, which was subsequently transferred to this District
and consolidated with the Pennsylvania and Maryland actions. Unlike the Pennsylvania and Maryland classes,
Plaintiffs do not specifically seek a declaration that they should be classified as employees under the applicable New
Jersey laws.

performed; and

C. Such individual is customarily engaged in an independently established trade, occupation, profession, or business.

*Bedoya v. Am. Eagle Express Inc.*, 914 F.3d 812, 816 (3d Cir. 2019) (emphasis added). "The failure to satisfy any one of the three criteria results in an 'employment' classification." *Hargrove*, 106 A.3d at 458.

"In order to satisfy part A of the 'ABC' test, the employer must show that it neither exercised control over the worker, nor had the ability to exercise control in terms of the completion of the work." *Id.* at 459. "[I]t is not necessary that the employer control every aspect of the worker's trade; rather, some level of control may be sufficient." *Id.* "Part B of the statute requires the employer to show that the services provided were either outside the usual course of the business or that such service is performed outside of all the places of business of the enterprise." *Id.* (internal punctuation omitted). "Part C . . . calls for an enterprise that exists and can continue to exist independently of and apart from the particular service relationship." *Id.* "The enterprise must be one that is stable and lasting—one that will survive the termination of the relationship." *Id.* "Therefore, part C of the "ABC" test is satisfied when an individual has a profession that will plainly persist despite the termination of the challenged relationship." *Id.* "When the relationship ends and the individual joins the ranks of the unemployed, this element of the test is not satisfied." *Id.*

The essential elements of the ABC employee test are provable by common evidence. Because "[t]he failure to satisfy any one of the three criteria results in an 'employment' classification," *Hargrove*, 106 A.3d at 458, Plaintiffs need only show that one of the factors is not met. As to Part A—the putative employer's ability to exercise control—as discussed in analogous contexts above, common evidence would predominate in making this determination.

Separately, Part B is provable by common evidence, because the question of whether distributors' functions are "outside [Flowers'] usual course of the business or . . . performed outside of all the places of [Flowers'] business," *Hargrove*, 106 A.3d at 459, will require evidence of Flowers' business model and general operations, *see Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1059 (7th Cir. 2016) (holding that "[t]here is no doubt that common evidence will satisfy" Part B of a similar ABC test, because Part B "only requires common evidence about [the defendant's] business model").[7]   Accordingly, because two of the three factors of the ABC test are readily provable through common evidence—and Plaintiffs need only establish one to prevail on their claim—their employee status is susceptible to class-wide determination.

Assuming Plaintiffs prevail on the classification issue, the next question is whether Flowers violated each of the statutes.  Plaintiffs assert that Flowers violated the NJWHL by failing to pay overtime.  Like the PMWA and the MWHL, the NJWHL parallels the FLSA.  *See Hargrove*, 106 A.3d at 463.  As in those contexts, to establish that an overtime violation occurred—*i.e.*, that Plaintiffs "performed work for which they were not fully compensated under the NJWHL"—distributors again may rely on the common evidence regarding their delivery obligations.  *Genarie v. PRD Mgmt., Inc.*, 2006 WL 436733, at *18 (D.N.J. Feb. 17, 2006).  Again, the parties point to no distinctions between the PMWA, MWHL, and NJWHL that would bear on the certification question.  Accordingly, for the reasons given in those contexts, predominance is satisfied as to the NJWHL claim.

Separately, Plaintiffs assert that Flowers failed to pay all wages due and made impermissible deductions, in violation of the NJWPL.  "New Jersey state law provides that an

---

[7] In additional to arguing that common evidence will not predominate, Defendants argue that Part B is preempted by the Federal Aviation Administration Authorization Act.  This argument was recently rejected by the Third Circuit. *Bedoya v. Am. Eagle Express Inc.*, 914 F.3d 812, 816 (3d Cir. 2019) ("[T]he FAAAA does not preempt the New Jersey law for determining employment status for the purposes of NJWHL and NJWPL.").

employer may not withhold or divert an employee's wages unless the employer is empowered to do so by New Jersey or United States law or unless the amounts withheld or diverted or for specific, itemized reasons set forth in the statute." *Crespo v. Kismet Exec. Limousine Serv., Inc.*, 2018 WL 3599738, at *6 (D.N.J. July 27, 2018) (citing N.J. S.T. § 34:11:4-4). To resolve this claim, "a trier of fact will decide (1) whether Defendants withheld wages from Plaintiff; (2) the purpose for withholding such wages; and (3) whether the purpose for withholding wages is one of the itemized reasons set forth in the NJWPL." *Snyder v. Dietz & Watson, Inc.*, 837 F. Supp. 2d 428, 445 (D.N.J. 2011). As in the Pennsylvania and Maryland deduction claims, this claim is susceptible to class-wide proof, because it may be proven through common evidence regarding the categories of deductions and Flowers' asserted justifications for those deductions.

*     *     *

For the reasons given, the predominance requirement is satisfied as to each claim asserted by the Pennsylvania, Maryland, and New Jersey classes.

### iii.    Rule 23(b)(3)—Superiority

"Rule 23(b)(3) requires that class treatment be 'superior to other available methods for fairly and efficiently adjudicating the controversy,' and it provides a non-exhaustive list of factors to consider in determining superiority, including: the class members' interest in individually controlling the prosecution of separate actions; the extent and nature of any similar litigation already commenced by class members; the desirability of concentrating the litigation in a particular forum; and the difficulties likely to be encountered in the management of a class action." *In re Cmty. Bank of N. Va.*, 795 F.3d at 408-09 (quoting Fed. R. Civ. P. 23(b)(3)). "The superiority requirement asks a district court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *Id.*

As applied to the Pennsylvania, Maryland, and New Jersey classes, these factors weigh in favor of class litigation. Given the number of class members, the common interest in correctly determining the employee status of the class, and the prevalence of common questions of law and fact, a class action provides a significantly more efficient litigation vehicle than individual trials. As to the existence of overlapping litigation, there are a number of similar suits against Flowers winding through the federal court system elsewhere,[8] but each is confined to a separate geographic area, and does not appear to involve the class members here—*i.e.*, distributors in Pennsylvania, Maryland, and New Jersey, respectively. Further, given the difficulty of mounting litigation, and the limited resources available to the individual distributors, individual suits would likely impede resolution of the individual class members' claims. Finally, there are considerable efficiency gains in concentrating all three of these class actions in this Court, given the many similar issues applicable to their claims. Defendants, for their part, make no argument regarding superiority. Accordingly, this requirement is satisfied.

*    *    *

In sum, for the reasons given, certification of the Pennsylvania, Maryland, and New Jersey classes pursuant to Rule 23(b)(3) is warranted.

### iv. *Rule 23(b)(2) Certification Is Not Warranted*

Plaintiffs contend that certification of each class is also appropriate under Rule 23(b)(2) in order to declare that all members of the class are employees under the relevant statutes. Whereas Rule 23(b)(3) certification is appropriate where common issues predominate, Rule 23(b)(2) applies when "the party opposing the class has acted or refused to act on grounds that

---

[8] *See, e.g.*, *Rehberg v. Flowers Baking Co. of Jamestown, LLC*, 2015 WL 1346125, at *14 (W.D.N.C. Mar. 24, 2015) (granting class certification and FLSA final certification as to North Carolina distributors); *Noll v. Flowers Foods, Inc.*, 2019 WL 206084, at *1 (D. Me. Jan. 15, 2019) (granting class certification and FLSA final certification as to Maine distributors).

apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "[T]he key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful *only* as to all of the class members or as to none of them." *Shelton v. Bledsoe*, 775 F.3d 554, 561 (3d Cir. 2015) (quoting *Dukes*, 564 U.S. at 360) (emphasis in original; internal quotation marks omitted). This contrasts with (b)(3) classes: Rule 23(b)(3) "allows class certification in a much wider set of circumstances but with greater procedural protections," because "[i]ts only prerequisites are that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Dukes*, 564 U.S. at 362. Further, unlike in the (b)(3) context, there are no opt-out rights for (b)(2) classes. *See* Fed. R. Civ. P. 23(c)(2)(B). Because of these differences, (b)(2) classes must be particularly "cohesive," meaning that "disparate factual circumstances" must be minimal among class members. *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998).

Here, Plaintiffs include their request for certification under (b)(2) almost as an afterthought, treating (b)(2) certification as flowing necessarily from (b)(3) certification. But "the two subsections actually create two remarkably different litigation devices," *Shelton*, 775 F.3d at 560, with (b)(3) permitting certification in a "much wider set of circumstances" than (b)(2), *Dukes*, 564 U.S. at 362. Further, courts diverge in their treatment of simultaneous (b)(3) and (b)(2) certification requests in analogous contexts. *See Atis v. Freedom Mortg. Corp.*, 2016 WL 7440465, at *8 (D.N.J. Dec. 27, 2016) (collecting disparate cases). Plaintiffs, by simply grafting the (b)(2) proposal onto the (b)(3) analysis absent further advocacy and analysis, have

failed to carry their burden to show that certification is appropriate pursuant to both sections.

*     *     *

Accordingly, Plaintiffs' motion to certify the Pennsylvania, Maryland, and New Jersey classes shall be granted with respect to the Rule 23(b)(3) class, and shall be denied with respect to the Rule 23(b)(2).

**v.        CONCLUSION**

For the reasons given, final certification of the FLSA collective action, and certification of the Pennsylvania, Maryland, and New Jersey classes pursuant to Rule 23(b)(3) is warranted. The state class actions shall not be certified pursuant to Rule 23(b)(2).

An appropriate order follows.


**May 7, 2019**                                                   **BY THE COURT:**

**/S/WENDY BEETLESTONE, J.**

**_____**

**WENDY BEETLESTONE, J.**